David, could you read the next page, please? 2019-01-18 in re Marriage of Julia Brooks Appellant by Louis Pignatelli and Bruce Brooks Appellate by Megan Mertens Okay, Mr. Pignatelli Thank you, Your Honor Good morning Good morning Your Honor, Ms. Megan Judges, this comes on an issue of what is conjugal cohabitation on a continuing residential basis This case involves a young lady who was divorced and had maintenance and a petition to terminate maintenance was filed The judge issued an opinion and I'm suggesting to the court that the judge makes errors in the opinion and the facts that she concluded existed First of all, there's the length of the relationship The parties, when they started dating again after a three-and-a-half month I hate it Actually, that was caused by Will having an affair We have that three-and-a-half month period where they both dated other people That would have been from May until the middle of August Now, they had, in the past 12 months prior to when they started dating in August, which is a critical time because the judge found, the judge found that that was what she called the tipping point By tipping point, she meant that that's when the conjugal cohabitation actually started and was the situation which caused maintenance to be terminated Let me just ask you one question before we go on there What's our standard of review? It manifests way to the evidence And so, the question becomes, looking at the six-prong test The court made a finding that the parties were in a relationship of two-and-a-half years I suggest to the court the most reasonable period of time would be after they came back in August of 2017 in the middle of August after school started because both of them had been dating for three-and-a-half months It was a new relationship to the extent that they had made what appeared though it wasn't It turns out to be a commitment to one another In the 12 months before August of 2017, they had dated for two months out of the 12 months They had started dating at the end of 2015 They broke up after a couple of months because Will, again, had a certain person who he was dating At the same time, he was dating Julie So, I'm suggesting to the court that the finding should have been, really, the three-and-a-half month period Now, the amount of the couples, the court found, the amount of time the couples spent together staying together almost every night was the finding That wasn't the case As a matter of fact, Will, who was the boyfriend during the period of time that maintenance was terminated was also the chief of police of the city where he lived As chief of police, he stated that he had replaced, in August of 2017, one to two men He stated that because he had these men replaced, he had to train them And that he would be working double or triple shifts His shifts were eight hours And if he's training the two officers, their shifts were 13 hours Well, I guess, in a word, my question is going to be, so what? Because, let me say, in my former life, I was a cop My wife's a nurse There were times we'd go for months And I'm working double shifts, different shifts she's working The fact that we passed each other in the driveway didn't mean we weren't living together as less than a wife Well, it's the amount of time that couples spend together and whether they have any kind of an intimacy There was a special commitment, I would imagine, that you made to your wife and she made to you And it wasn't a new relationship And if you would have been asked on the stand whether you were together every night and maybe you were together every night The bottom line is, Will wasn't with her every night Will would come by at 2 in the morning when he finished the shift in Tampico or at the end of his day at 12 to 1 o'clock, 2 o'clock in the morning if he did a triple shift even later And he would go past, on his way home, her condo He didn't have a key to the condo And he wouldn't awaken her So he didn't see her So the finding that they are together in a residence on a continuing basis just wasn't the case because of his schedule which didn't allow him to be with her every day or every night So I think that's the difference perhaps in your situation You probably went home to your wife at some point in time He didn't have that luxury And what made matters even worse is he became a part-time officer in Tampico working weekends from 6 until 2 in the morning And he would also take other hours as they became available to him which means that he had an even more difficult time seeing her because his schedule just wouldn't permit it The third thing that made it impossible is he has two daughters His divorce decree said that they couldn't be with someone to whom he wasn't married It limited her ability to relate to these children, that is, Julie's So every other weekend, he had them beginning Friday for a weekend So that made it even more difficult to spend those evenings with her that he said he spent Now, he makes the statement and then he takes it back on cross-examination because he says that, indeed, until we were engaged, which was in December, he says, of 2017 Until that time, he says, it was as our relationship was back in 2016 and 17 The relationship then was seeing each other She would be at his house, at his home a couple of times a month and he would be at her home a couple of times a month and she at his one time a month So that's a far different level of intimacy and commitment with two households being maintained Well, another question is, who's in a better position to make credibility determinations? Us, looking at the record, or the trial judge, looking at the witness? Well, you know, Judge, that's an interesting point and I think that you looking at the transcript, you're going to be in a better position I'm not sure that the judge, presiding judge, had that available Time after time, we see a statement made by this man and then in cross-examination, we find it just to be the opposite For instance, the prime example, probably the saddest example is the petition to terminate maintenance was filed December 22nd Now, Will says that, she had broken her shoulder She says that she terminated the relationship with him because she received the petition and that she was very upset she received the petition before Christmas and that she asked him to make certain statements suggesting how to respond Well, the thing about that is, when he says she would have received it and reacted to it it hadn't even been filed yet It was filed on December 22nd Now, most of the time, that would be perhaps inconsequential But it is in this case because the 22nd was a Friday So, putting it in the mail on Friday, Saturday, Sunday, Monday, the 26th, Tuesday was a holiday So, the earliest even excellent mail service would be we would have it on the 27th and that's a short week, Friday, Saturday, and Sunday and we would have then gotten it off to her at some point in time probably the second weekend in January But those statements had to be false because the petition wasn't filed So, she can't be reacting to it She can't be upset about it and she can't be telling him what to say if she doesn't even know the petition to terminate maintenance has been filed and that goes to the credibility and that's why I think that if you have the record and you see these things happening just like the court found that they regularly do lunch together Well, that's not true He said, well, we do regularly do lunch but then on cross-examination, what do you have for lunch? Well, I go to her place and we have leftovers Turns out that he doesn't eat lunch there  They will overlap a little bit, so he eats lunch before he sees her But that's in the statement that he knows what the situation is and he then changes and whether it's intentional or mismemorization it certainly impugns his credibility, I suggest to you Another thing that on the 17th of December Well, the court finds that when Julie purchased a home she did so to facilitate bedrooms for the children his two children because at that point they were engaged They had been engaged It depends on He says December, Julie said November 11th And Julie was won by the condo because she was given an ultimatum Buy the condo or I'm going to raise the rent from 700 to 900 She enters into a contract Her father helps her get the financing in place to make the deal It turns out that it can't be made because the title is messed up The Condo Association And it just didn't So she couldn't buy it So she was looking for a place for the longest period of time She sees an ad on the internet She recognizes the home as being the home of a friend of hers She's been in that home And she likes the home So she immediately goes over to her friend's house that afternoon And she buys it Now, I'd say this is an indication that there's a lack of certainly a lack of any closeness between the parties The lies, whether this is a relationship of conjugal nature There's no interrelation of personal affairs Because she doesn't even ask him She goes over without him He does come over Now the judge finds that The judge finds that That house was purchased with the two bedrooms to facilitate bedrooms for the children But it wasn't It was purchased because it's a home that she finally found That she liked and could afford it And she wanted to get her home purchased So she could have the real estate taxes and the interest deductions And she says that So to characterize it To characterize it, I'm suggesting As a home for the children Is just an inadequate characterization Of what that transaction was about Mr. Pringle Could you talk a little bit about their financial arrangements? They had no financial arrangements They contributed nothing towards the other They didn't have any joint checking accounts The home purchase is an excellent example It's a big thing They're supposedly engaged He doesn't pay any of the costs She installs a $850 carpet upstairs He pays none of that So she went on her own Her father did things that you would expect a person close to her to do He arranged the financing Helped her fill out the financing statements Attended the closing Reviewed the contract with her Brought it in for an attorney to review And he didn't do anything for the transaction They had no joint checking accounts They would go Dutch very frequently Even when they went Or when they were going to have a meal fixed by one of them Both of them stated they didn't have anything in the cupboards So they would have to go to the store and buy And when they went to the store and bought the meal The ingredients They would divide the cost 50-50 They'd have to come back and cook it And you can imagine with a schedule like his They didn't eat together very frequently Because there wasn't time to do all of that The other thing that the judge mischaracterized She says that they ate out frequently Well, when he was asked on direct examination how frequently And whether they're scheduled As the judge indicated in her opinion He said, well, a couple of times a month And there's no set schedule There's no set date Don't do it Friday night or Sunday night or whatever And so, and Julie said the same thing It was at least not more than one time per week Well, that goes to the closeness and the intimacy And they're continuing actually relating to one another How often did they go out to eat? A couple of times a month And what's that got to do with their relationship with each other? Well, it's something they do together It's something, they have a meal together And the judge found it important Because she noted that that's something they do So it's a part of what she And I think that's a misperception of what the testimony showed Just like Julie didn't buy that house For the garage or for the bedroom Because it was a home that she knew and appreciated and liked And there wasn't Still in that house? No, she got rid of it after a couple of months Because when she tried to reinsure the house They gave her things that had to be done to the house It had to be painted, improvements had to be made Which would cost her thousands of dollars And there was a $500 plumbing bill she incurred almost immediately And she thought, I don't have that kind of money So I'm going to She ended up by selling the house And getting an apartment where she knows exactly what she's going to be spending So you have two names So if we look at these various things that we've set forth We find that We find that Especially in the area where she terminates the relationship with him That she had good cause Because on January 5th She finds out again that he is seeing this lady She's had shoulder surgery on the 19th of December She's had pins refreshed in her clavicle And he gets angry at her And he tosses her up against the wall And so she then at that point says I'm not going to do this anymore And as happened in all the other instances He denies that he reacted in this way Only to have to admit it on cross-examination That's why I think the record is particularly important Because it shows what his initial statements are And it shows what really happened Because by being cross-examined He does come forth with the truth And the truth, unfortunately Doesn't support the fact that this was the type of What motive does this guy have to lie? Well, first of all, they didn't part on good terms Secondly, he tried to get back with her When she fractures her clavicle It's after they broke up She says it's over at the new residence And he leaves She's carrying something upstairs And she fractures the clavicle She goes to bed that night Because she's hoping it's not serious The next morning, it is serious She doesn't call him She calls her father He tries to get in touch with her She says, I want nothing to do with you He says, I'll come over She says, don't come over He eventually does after the surgery And for a short time He's helping her, supposedly And her mother and father are helping her But the bottom line is She didn't want him over And then she gets additional information About the relation that he's having So, why He was called by the respondent Who filed the petition I don't know what background there is between them I don't know whether he just wasn't prepared Whether he was just guessing But the bottom line is When we get down to what the truth is Versus what he said We see that this isn't a conjugal type of relationship They're not together every night They're not having their meals together They're not having They're not buying gifts for each other They're not going on vacations with each other They're not He says, we go every holiday As any other couple would Like an Easter and Memorial Day Turns out Out of the two years One Easter No Memorial Days No Labor Days No Fourth of July No New Year's Eve No New Year's Day That's not the holiday visitation he attempts To represent to the court That's taking place Counselor, your time is up Thank you Thank you Ms. Morgan Good morning Good morning May it please the court My name is Megan Mertes And I'm here on behalf of Bruce Brooks Who is present with us today This court, to answer your question It's a manifest way of the evidence review Mr. Pignatelli argued before you today And in his brief And he is arguing for a de novo review He wants your honors to re-weigh the evidence And make your own assessments And that's simply not the standard of review That is applicable to this case Both Sunday and Miller cases Clearly, and Herron and Walter All those cases use a manifest way of evidence Okay, so what would Mr. Pignatelli have to do Under that standard of review To get a reversal In the case of the trial judge's order? He would have to show That the trial court's finding Was against the manifest way of the evidence What does that mean? If there's an opposite conclusion As clear from the record Or if the finding is unreasonable Arbitrary And without a basis in the evidence And it's simply There's numerous bases in the evidence This morning you heard Mr. Pignatelli Argue about Mr. Luke Hart's shifts And how he simply couldn't have been there That he testified to in the record Page 99 to 100 He testified that after they got back together In August He was with her every night Don't take his word for it Take the word of the private investigator Who has video evidence That the court watched Of Mr. Luke Hart Pulling into her garage And pulling out of her garage On various dates Also, the private investigator Had surveillance of the garbage On garbage days There was garbage at Julia's house There was no garbage at Mr. Luke Hart's house On numerous garbage days There was The private investigator actually pulled the garbage And there was evidence of Certain personal daily living type of things That you would find in the garbage Julia testified she didn't wear contact lenses There was garbage with contact lens solution He used chewing tobacco Julia didn't use chewing tobacco There was chewing tobacco in her garbage So don't take Well, Luke Hart's testimony Look at other Other correlating testimony To show that the judge rightfully Weighed the credibility of the witnesses And simply didn't believe Julia Brooks The judge rightly found In this case That the totality of the circumstances That there was a de facto marriage And the court used that six-factor analysis To reach that conclusion And the facts that the trial court elicited Support that a de facto marriage Did indeed exist between Will and Julia That first factor The length of the relationship This morning, Mr. Pignutelli argued Oh, we should only look at once they reconcile Your honors, this was a two-and-a-half year relationship The parties started Will and Julia started dating in 2015 Summer or fall Depending on whose testimony you want to believe But they started dating in 2015 Sure, they had a couple breakups The length of those It would depend on who Who was more credible Whether it was They were broke up the whole summer Or they were really kind of still together Maybe going on dates with others But it was a two-and-a-half year relationship Justice Schmitt and Justice Holridge And Walther You found that a two-year relationship Where there was only a period That they actually lived together for six months Was sufficient to find cohabitation Of a continuing resident on a conjugal basis And Walther is very similar to this case But other courts have also found That time alone is not the determining factor And that was the Ruth case In Ruth, they had only lived together for six weeks Prior to the hearing In that case, yet the court found That there was cohabitation So the trial court rightly weighed the evidence And this factor weighed heavily in favor That they had a lengthy relationship The second factor is the amount of time The couple spends together Again, you look at Did they share a day-to-day existence? And there was simply a lot of evidence In the record of support That they shared a day-to-day existence He had access to her house He testified that at one of the residences He had a key or a garage door opener That he testified that if he beat her home He'd pick up her mail That he had lunch That he would heat up the leftovers for lunch That they would eat dinners frequently together He stored personal items there Which is a significant factor The Susan case That they did not have any evidence That they had any personal belongings At each other's residence Yet in this case, there's ample evidence He had a motorcycle that was there In fact, he received mail Regarding that motorcycle at her address He had his grill at her address He had items of personal clothing at her house And he had his day-to-day contact solution That type of items at her house So there's ample evidence To support the second factor That they shared a day-to-day existence The courts also look at the nature Of the activities they engaged in Again, they grocery shopped together He did household chores He mowed her yard She laundered his clothing He purchased a cat for his children That was at her house Oreo, the cat, was at her house It was for his children He exercised parenting time at Julia's residence And in fact, Nicole Willcard, his ex-wife Testified that that had caused a rift There's simply the nature of the activities They engaged in Supports that the trial court properly found That the totality of circumstances Supported that they were in a de facto marriage Now, Justice McDade, you had asked a question Regarding the interrelation of their personal affairs And I will agree with Mr. Cunetelli There was no evidence that they had a joint checking account Or that, you know, they changed the beneficiaries However, that is not the deciding factor On this factor In the Walther case Justice Holdridge and Justice Schmidt You looked at whether aspects of their lives Were intermingled And the court in that case Had stated that the only area that wasn't interrelated Was finances, driver's license And vehicle registration And the child's school registration But in all other aspects Their lives were intermingled And that is the case in this case Their lives were intermingled And significantly, after When they got back together in August of 2017 You not only have that Julia purchased a new house She went from a two-bedroom condo To a four-bedroom house Will Lucart testified That that was because he had children And that they were going to be living together They become engaged in that house Will Lucart testifies that he was going to begin Making financial contributions in the future And coincidentally enough Nine months after their relationship ends She sells the house That is another factor That you should take into account When you're looking at Whether or not their lives were interrelated They had a serious relationship This was not like the Miller case This was much more than an intimate dating relationship In Miller, he had no testimony that they were They wanted to get married That's the same in the Sunday case In this case, they became engaged They went and bought rings for each other They became engaged in the house The four-bedroom house That there is plenty of evidence To support that this factor Again, weighed in favor of finding that a De facto marriage existed Is this different from a typical engaged couple? I mean, don't people who are engaged Make plans and they think Okay, yeah, we need to buy a house One of them buys the house There's a plan down the road After they get married That the other person will contribute To the cost But they don't at the time What distinguishes this from Just a typical dating relationship? I think all the other factors we've discussed We have that he's spending Pretty much every night together That he's exercising his parenting time at her house That he is having lunches together Dinners together That they are in a serious committed relationship They are intermingling They are cohabitating And the trial court properly found That all of these factors Not just the engagement It wasn't just, oh, you became engaged Because they became engaged in November 2017 The trial court found that August 2017 That's when the totality of circumstances That Will and Julia were cohabitating On a continuing, conjugal, resident basis And it was not against The manifest weight of the evidence The manifest weight of the evidence Overwhelmingly supports that decision And this court should not Reverse that decision Was there anything in the relationship That eliminated her need For maintenance? That is not a factor That the court should consider In fact, the older cases Sorry The Susan case discussed How the recipient's need for maintenance Shouldn't be a factor That is analyzed When we're looking at cohabitation Whether or not the court cohabitation exists We're looking for the existence Of a conjugal relationship That has supplanted the other relationship So, I'm sorry, I don't agree With whatever case says That that's not relevant Well, in this case Then if you look at Their intermingling of their personal relationship That they share that day-to-day existence Maybe they didn't share a bank account But if you look at In the modern age Is that even in most marriages Do people always share a bank account? So, it would be something more In that they were having lunches together Grocery shopping together Sharing household chores All of these factors show that Maybe they weren't sharing a bank account But there is an implied Assistance there He had stopped his cable at his house He bought the moving van And tried to move her into the new house On Albany Street So, there is evidence That they were sharing Some financial assistance Between each other And that is enough With the case law To support that factor That they had That interrelationship Of their personal affairs Okay, could you say Whether or not The financial relationship Was sufficient To eliminate her need For maintenance? There was no evidence I mean, that was not elicited There was no evidence At the trial court Regarding her The finances of Julia Versus And whether or not They had increased Or decreased Does the case law Suggest that's a factor To be considered? No, the case law Explicitly says It shouldn't be considered There's some earlier case law The cases of Cardona and Bramson They discussed And that's why Those cases should not Have much weight Because they intermingle The recipient spouse's Continuing need For the financial support In the Susan case When it came out It went through with the analysis It went through Saffington It went through Cardona It went through Branson And the Susan case said The recipient's Continuing need for maintenance Isn't a factor When someone goes out And gets married It automatically terminates So why would it be a factor When they're cohabitating? Because, you know Some people would realize Hey, if I get married I'm going to lose my maintenance So I might just live with someone And not take that extra step But that's still not fair To the payor spouse If that relationship Between the recipient spouse And the new boyfriend or girlfriend Rises to the level Of a de facto marriage And in this case The facts support That the totality of circumstances That they were de facto married The final two factors Whether they vacationed together And whether they spent Holidays together Again, there is evidence To support those two factors They took a trip to Galena They went to the Wisconsin Dells They also traveled to his parents With his children Or his mom With his two children To celebrate Christmas one year They spent holidays With her family Easter and Thanksgiving They spent Christmas Eve together I want to go to Mr. Pignatelli In his arguments Was talking about the breakup And that she had the surgery And that they were broken up Before the surgery It was evidently clear That the trial court Did not believe Julia Brooks' testimony In its decision And this factor Is one of the To highlight why it is Maybe the trial court Didn't place much weight On Julia Brooks' testimony The private investigator Had a video That was taken After her surgery Showing Will Lucart Going to the house On Albany Street In his uniform With his kids They go in the house Minutes pass They come out He's changed He's changed his clothing He didn't carry Other than book bags He didn't carry Clothing in there He comes out With his kids Probably because His parenting time Had ended But it was well after The surgery The state that she said That they had broken up He's also arguing On the timing of When she received The petition How oh That was unbelievable None of those facts Are on the record It was served On the 22nd On counsel It was electronically served But there's no testimony Regarding how it was sent To Julia And when she had it So you best place weight On Will's testimony That she received it She became angry And she was telling him What to say Because she knew That they had cohabitated The facts support That the totality Of the circumstances That they were in A de facto marriage They had also Unlike the Miller case They had tried to hide it She had told him To park in the garage You have the evidence From the private investigator Of them pulling in And out of the garages This was a case Where they had A committed relationship That they became engaged That they shared Holidays together They went on vacations together They shared A day to day existence He had access To her house Was arriving there To pick up her mail They were doing Household chores together He was exercising His parenting time His child's cat Lived in her house This was a level That rose to a de facto marriage And it was not Against the manifest weight Of the evidence For the trial court To grant the petition To terminate maintenance And I would respectfully request That this court Affirm the trial court Thank you Thank you Mr. Pignatelli Interesting that Counsel would bring up The surgery And that he was there After the surgery Because he wasn't there After the surgery He was there On the date of the surgery He had a key Which was to be used For sorting certain things    And she didn't even know He was at the house Now he goes in Because he was In the house And he was In the house And he was In the house And he was In the house And he comes out And street calls him Well that's not unusual Because she was Doing his laundry In exchange for him Mowing the lawn So he would bring A laundry basket Full of laundry And she would then Do it and return it to him You know what My wife does my laundry In exchange for me Doing the lawn Okay But the point is That it would not be unusual For him to be able To change Without having A wardrobe there Because her sister Her friend Who helped her move She testified That he had not Nothing there As far as a wardrobe He had toiletries Which she took with him And dropped off Alright Let me ask you A question Just as Dave Raised something About the need For maintenance So if a woman Receiving maintenance Goes out And marries Some stumble bum Who's $200,000 In debt Got gold collectors After him Doesn't have Two nickels Put together That they get married Does she still get Maintenance Because she needs it Well there's There's a formula To be used So we don't have To worry as much About judges Making a decision Based on ability To pay In a situation Like that Without any income He's going to not Pay much by way Of any maintenance And it may be Reserved by the court I wouldn't That I think So does the woman That marries this guy Continue to get Maintenance From her former husband Because she still Needs maintenance Notwithstanding The fact that She's married No she wouldn't She wouldn't And that's not The case Counsel I'm glad Brought up the Madigan What I call P.I. Fiasco During the Period of time From September 16th Through December 20th He was In the area Surveilling Julie 20 times Of those 20 times 14 times His bucket came up Empty He didn't see Them together He was at Their home He didn't see Them Pull out Of the Drive At the Same time And so The question Becomes Does the Results of His investigation Support Ashley The respondent Who doesn't Want the Maintenance Dropped Because All the Times that He was At the Home And didn't See them Together Does that Support Ashley The Respondent Concludes That This must Be Cotton's Local Habitation Because He's Living There When They Examine Will Under Oath And Talk About Why Is It There He Didn't Know It Was There He Said It Was An Accident He Said I Was At My Insurance Agents They Wanted To Know Where I Was Going To Go I Was At My       Where I Was Going To Go He Didn't Know It Was An Accident He Said I Was At My Insurance Agents They Wanted To Know   Was Going To Go He Said I Was At My Insurance Agents They Wanted To Know Where I Was Going To Go He Didn't Know       I Was At My Insurance Agents They Wanted To Know Where I Was Going To Go He Didn't Know  I Was Going T Hmmm Was Going To Know Where I Was Going To Go He Wasn't Feeling Good Not Not Happy No Not Happy Not Happy Not Happy        To Know Where I Was Going To Go He Was Not Happy Not Happy Not Happy Not Happy To Know Where    To    Not Happy To Know Where I Was Going To Go He Was Not Happy To Know Where I Was To Know Where I Was Going To    Not Happy To Know Where I Was Going To Go He Was Not Happy To Know Where I Was          Where I Was Going To Go He Was Not Happy To Know Where I Was Going To Go He Was